NOTICE

Decision filed 08/25/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 180348-U

NO. 5-18-0348

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 03-CF-1744 |
| | ) | |
| EDWARD S. PHILLIPS, | ) | Honorable |
| | ) | Stephen P. McGlynn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the defendant waived his marital privilege by communicating similar or identical facts with third parties, his trial and appellate attorneys were not ineffective for failing to raise the waived privilege. Where the defendant is unable to establish prejudice due to the State's omission of a second recording of a voicemail message to the defendant that would have provided an additional basis for impeachment, the defendant has not established a *Brady v. Maryland*, 373 U.S. 83 (1963), violation. Where the defendant is unable to rebut the presumption that postconviction counsel provided effective assistance, we deny his claim. We affirm the trial court's second-stage dismissal of the defendant's postconviction petition.

¶ 2    The State charged the defendant, Edward S. Phillips, with one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2002)). The murder was committed in St. Clair County on December 31, 1999. After a jury trial, the defendant was convicted, and the trial court sentenced the defendant to a term of 55 years of imprisonment. The defendant directly appealed his conviction and sentence to this court. We affirmed. *People v. Phillips*, 2011 IL App (5th) 070416-U.

1

¶ 3     This appeal involves the defendant's postconviction petition, in which he raised multiple issues of ineffective assistance of both trial and appellate counsel. As our review will necessarily mandate consideration of the underlying facts and evidence at trial to adequately assess the ineffective assistance claims, we are utilizing the background as stated by this court in its order on the defendant's direct appeal. For the reasons stated in this order, we affirm the trial court's second-stage dismissal of the defendant's postconviction petition and deny the defendant's claim that postconviction counsel was ineffective.

¶ 4                                         I. BACKGROUND

¶ 5     On December 31, 1999, Amy Blumberg was shot and killed while she was working in her aunt and uncle's dance apparel store in O'Fallon, Illinois—On Stage Dance Apparel. Her body was discovered by her parents. Law enforcement investigated the crime which culminated in the filing of a criminal complaint against the defendant, Edward S. Phillips. The investigation and its focus upon the defendant as a suspect began when the O'Fallon Police Department received an anonymous telephone call in late 2003. That call led to follow-up calls and a meeting with an attorney, John Leonard, who was representing a woman in a divorce case. The woman was Dawn Phillips, the defendant's then-estranged wife. She provided information to the police that the defendant had been in the dance apparel store on the date of the murder. At the grand jury proceedings, it was revealed that Dawn told the police that on the date of the murder, the defendant left the home in the morning with a small handgun and came home that night with a large amount of blood, or something that looked like blood, on his pants. The next day, the defendant told her that he discovered the store clerk's dead body after he came back to return merchandise that he had purchase earlier that same afternoon. The defendant was charged with one count of first degree murder on December 23, 2003. A warrant was issued for his arrest and was served upon him on

that same date. Bail for this first degree murder charge was set at $1 million. The indictment was filed on January 16, 2004, and contained one count of first degree murder, alleging that the defendant shot Amy Blumberg in the head with a firearm without lawful justification and with the intent to kill or to do her great bodily harm.

¶ 6    At the time that the defendant was indicted for first degree murder, he was in custody in Brown County, Illinois, on other charges. On December 19, 2003, the defendant was charged with perjury, burglary, and three counts of unlawful violation of an order of protection in Brown County. On December 31, 2003, the defendant was charged with obstructing justice. On March 29, 2004, the defendant was charged with another count of burglary in Brown County. On March 31, 2004, Brown County authorities charged the defendant with another count of unlawful violation of an order of protection. Ultimately, the State dismissed two of the counts of unlawful violation of an order of protection on May 12, 2004. The case was tried before a jury, and the defendant was found guilty of all remaining charges. The defendant was sentenced on the Brown County convictions on June 24, 2004. He received a 4-year prison sentence on the perjury conviction, a 3-year sentence on the first burglary charge, 185 days in jail on the first violation of an order of protection conviction, 1-year prison sentence on the obstructing justice conviction, a 3-year sentence on the second burglary charge, and 364 days in jail on the other conviction of unlawful violation of an order of protection.

¶ 7    The defendant was arraigned in St. Clair County on this murder charge on September 2, 2004. He was determined to be indigent, and an attorney was appointed for him. The State indicated that it would not be seeking the death penalty, but that it intended to seek an enhanced sentence of natural life imprisonment due to the allegation that the victim was murdered in the course of another felony—attempt aggravated criminal sexual assault.

3

¶ 8                    A. Testimony and Evidence at Trial

¶ 9                    1. *Kenneth and Susan Blumberg*

¶ 10    Kenneth and Susan were the parents of the victim, Amy Jennifer Blumberg. Amy was working in the dance store owned by her aunt and uncle on December 31, 1999, while she was home on break from her college courses at Eastern Illinois University. She was 20 years old.

¶ 11    At about 6 p.m. on December 31, 1999, Kenneth and Susan Blumberg began receiving phone calls from her friends wondering where Amy was. Amy had plans to spend the evening with some of these friends to celebrate the new year. Susan made multiple calls trying to locate Amy without success. They assumed that Amy must have stopped off somewhere on her way home. But, after some time had passed, they became concerned and decided to drive to the store. On the way to the store, they received a call from the manager of a pizza restaurant nearby in O'Fallon. That manager, Bob Uhrig, was a dear friend to Amy. Bob sent an employee down to the store to check on Amy. That person reported that the door was not locked, that the lights were on inside the store, that Amy's car was in the parking lot, but that Amy was not inside the store. The Blumbergs arrived at the store at about 9 p.m. After entering the store, Amy's parents saw blood on the doorjamb of the entryway to the hall in the back of the store. Kenneth Blumberg encountered a "tremendous amount of blood" in the hallway. Susan Blumberg called 911 to report the finding of blood and to request an ambulance. Kenneth came back to the front part of the store and told Susan that they were "too late." They waited outside the store at the direction of the 911 operator until police arrived at the scene.

¶ 12                    2. *Stipulation of Maureen Blumberg*

¶ 13    The parties agreed to a stipulation as to a couple of things that Maureen Blumberg, Amy's aunt, would testify to if she had testified at trial. Maureen Blumberg was a co-owner of the store.

Maureen told Amy that she could close the store at 2 p.m. The last recorded sale at the store was at 2:25 p.m. This was a cash purchase for a child's black leotard.

¶ 14                                    3. *Andrew Whitehair*

¶ 15    Andrew Whitehair testified that on December 31, 1999, he was a driver for Pizza World, an O'Fallon restaurant. Andrew's manager at Pizza World, Bob Uhrig, asked him to go to the store to check on Amy. The time of this request was approximately 8 p.m. Andrew drove past and saw a car on the parking lot. Upon return to the Pizza World location, he called Bob and told him about the car that he saw on the parking lot. Bob confirmed that this was Amy's car and asked Andrew to return to the store to see if she was there. He returned. He exited his car and knocked on the doors to all of the businesses in the building. The store still had the lights on. Andrew tried the door, which was unlocked. He walked in. He saw nothing amiss. He called out Amy's name a couple of times with no response. He did not go further than the front part of the store. He left the store and returned to Pizza World. He called Bob again to tell him that Amy did not seem to be there, although her car was there, the lights were on, and the front door was unlocked.

¶ 16                                    4. *Officer John Stover*

¶ 17    O'Fallon police officer John Stover testified at trial that he arrived at the scene shortly after 9 p.m. on December 31, 1999. Sergeant Schaefer arrived at the same time. He and Sergeant Schaefer entered the store together. The store itself looked normal. However, the officers saw a trail of blood, as well as blood splattering on the floor of the hallway, which was on the left side of the store behind a door. Down the hall, the first unlocked door was the door to the men's restroom. The officers noticed a pool of blood, as well as blood splattering on the floor of the restroom. The hallway continued with a right turn where they saw the blood trail continue with additional splattering. That hallway ended at another door which led into the women's restroom.

5

Inside the restroom, the officers found the body of a white female on the ground with her head lying in a large pool of blood. Sergeant Schaefer confirmed that the woman was dead. The officers checked an adjacent store and then left the building.

¶ 18                                                    5. *Alva Busch*

¶ 19     Alva Busch, a crime scene technician, testified that he arrived at the scene of the murder at 9:35 p.m. on December 31, 1999. He testified that he saw a purse and keys on top of the counter in the store, and that the cash register in the store appeared to be undisturbed. He noticed what appeared to be blood on the door frame—about one foot off of the floor—leading to the hallway. He testified about the blood in the hallway, which he believed to have been caused by someone being dragged across the carpet towards the men's restroom. In the men's restroom, he located a pair of nylon pants, underwear, socks, and tennis shoes. To the left of the urinal on the floor, he found a tampon. The blood trail led from the men's restroom to the women's restroom. He indicated that the victim's body was lying on the ground with her legs widely separated. The victim was nude from the waist down, with part of her bra exposed on the left side. He was not then able to determine a cause of her death. In testimony upon his recall to the stand later in the State's case, Alva Busch testified about the various pieces of forensic evidence he collected in the forms of hair and fibers.

¶ 20                                             6. *Officer Kevin McGinnis*

¶ 21     Kevin McGinnis, a police officer from Mascoutah who is a member of the major case squad, was called upon to assist in the investigation of this case. He and Alva Busch went to the store to conduct their investigation on January 1, 2000. Officer McGinnis discovered what appeared to be a bullet fragment in the store next door. Looking then at the opposite wall in the store, they found a bullet hole in the wall in the front part of the store.

¶ 22                                    7. *Lieutenant Kurt Eversman*

¶ 23    Lieutenant Kurt Eversman was a St. Clair County Sheriff's Deputy at the time of this crime. On January 6, 2000, he was asked to examine a shell casing at the store where the crime occurred. While there, he searched for gunpowder residue on items in the store. He used an ion track vapor tracer. He found three indications of some gunpowder residue. The gunpowder residue was found on the cash register (which was the strongest alert of the three), in the hallway, and on a light switch in one of the restrooms.

¶ 24                                    8. *Detective Kerry Andrews*

¶ 25    Kerry Andrews was an O'Fallon police detective on call the evening of December 31, 1999. He videotaped the entire crime scene that night and returned to the scene the following day to do additional taping. He presented the video to the jury at trial, explaining what was on the tape.

¶ 26    On December 17, 2003, Detective Andrews was still a member of the O'Fallon Police Department. He participated in a search of the defendant's home in Mt. Sterling, Illinois, pursuant to the verbal and written consent of the defendant's ex-wife Dawn Ritchey. Detective Andrews, Detective Cavins, and the defendant's ex-wife, Dawn, were present during the search. Found at the residence was an empty gun box located in the attic above the garage. No guns were found in this search. Dawn acknowledged that the gun box was for a .380-caliber gun that they owned.

¶ 27                                    9. *Raj Nanduri, M.D.*

¶ 28    An autopsy was performed on the victim by Dr. Raj Nanduri on January 1, 2000. Before conducting the examination, Dr. Nanduri testified that she was unable to tell what caused Amy's death just by visual examination. Dr. Nanduri described bruises and scrapes on various parts of her body—an impact bruise on her left knee, a pattern bruise on her left hip, a large bruise on the front of her left upper arm, and a small bruise on her right breast—all of which the doctor believed

7

occurred before death. Amy was shot at close or intermediate range one time with the entry wound to the back of her left ear and an exit wound in front of her right ear. In Dr. Nanduri's opinion, the bullet wound would have caused a rapid death.

¶ 29                                      10. *Forensic Evidence Stipulations*

¶ 30    The parties stipulated to various items of forensic evidence. The stipulations were read to the jury. The red substance on the carpet in front of the cash register was human blood matching Amy's DNA. Blood and debris were found on a dress on a rack in the front of the store. The substance on the hallway door frame was human blood. The defendant's finger and/or palm prints were not discovered anywhere in the store. No semen was found on the underwear found in the men's restroom. Hairs on the nylon pants were consistent with the victim. One hair on the pants was not consistent with the defendant or with the victim. One hair on the victim's wrist was not that of the defendant or of the victim. Hair found on the victim's stomach did not belong to the victim or to the defendant. Semen was not found on any sample that was a part of the sexual assault kit collected from the victim's body. A hair collected from the victim's right ankle was consistent with the defendant's DNA profile.

¶ 31                                      11. *James Hall*

¶ 32    Forensic testimony was provided by James Hall. James confirmed a bullet recovered after firing is left with a unique impression from the gun used to fire the bullet. He testified that the bullet recovered from the scene was a .38-caliber bullet with six lands and grooves with a right twist. The caliber term was explained as the diameter or size of the bullet. A .38-caliber bullet can be loaded into a different size of cartridge case—like a .380-caliber cartridge case. This particular bullet was from the .38-caliber class of bullets, and upon closer examination, James testified that given the bullet's weight, design, and bearing surface, this bullet was consistent with a .380-auto-

8

caliber bullet. He further testified that the bullet could have been fired by a Bryco Arms Model 38, .380-caliber handgun, as well as by approximately 140 different weapons.

¶ 33    Without the actual gun used in the murder, which could be compared with the bullet fragment recovered from the crime scene, there is no forensic way to confirm that the defendant's .380-caliber Bryco Arms gun was the gun used in the crime.

¶ 34                             12. *Thomas Gamboe*

¶ 35    Thomas Gamboe was a forensic scientist at the Illinois State Police Metro-East Forensic Science Laboratory in Fairview Heights. He provided testimony about the potential candidates for firing the projectile recovered in this case. He testified that there were 16 possible .38-caliber guns. In the .38-caliber Special categories there were 23 possibilities. Between the .38-caliber revolvers and the .38-caliber Special derringers, there were 49 different possibilities. When asked how many actual weapons would have been in circulation of these 49 different possibilities on December 31, 1999, Thomas stated that it was impossible for him to say, but he guessed that the number would be in the millions of guns.

¶ 36                             13. *Dennis Aubuchon*

¶ 37    Dennis Aubuchon was a forensic biologist at the Illinois State Police Metro-East Forensic Science Laboratory in Fairview Heights. He tested the tampon which was recovered from the crime scene. No seminal fluid was found. He did not test to determine if the blood on the tampon was menstrual blood.

¶ 38                             14. *Donna Rees*

¶ 39    Donna Rees was a forensic scientist at the Illinois State Police Metro-East Forensic Science Laboratory in Fairview Heights. She primarily does DNA testing. She tested the string of the

9

tampon but only found the DNA of Amy. She was not asked to see if there was any DNA evidence on the shoes, or on any clothing.

¶ 40                                      15. *Leroy Yaeger*

¶ 41    Leroy Yaeger of Lebanon testified at the trial on behalf of the State. He and his daughter arrived at the On Stage Store at about 12:30 p.m. on December 31, 1999. The purpose of the visit was to exchange a leotard purchased for his daughter that was too small. At 12:30 p.m., the store was closed with a sign indicating that the clerk would return after lunch. Leroy and his daughter went to lunch. Upon return to the store, the store was open. When they walked in, Leroy noticed a man, who he estimated to be in his forties, looking through the clothing racks. Leroy's daughter proceeded to try various leotards on, until she found the proper size. While doing so, Leroy spoke with Amy and learned a bit about her educational background and career plans. Leroy's daughter overheard the man ask Amy if they sold dance shoes in the store. Before they completed their purchases, the man who had been looking through the racks left the store. Leroy and his daughter left. Later that evening, when he learned that Amy had been found dead in the store, he contacted the O'Fallon Police Department, ultimately working with a sketch artist to create a likeness of the man he saw in the store. Leroy testified that the man was wearing a pair of washed-out jeans with a dark-colored jacket. He recalled that the jacket reminded him of a ski coat. He also testified that there were two vehicles in the parking lot while they were there—a black car and a maroon car. There were no pickup trucks in the parking lot.

¶ 42                                      16. *John Toumbs*

¶ 43    A man by the name of John Toumbs who lives in Mt. Sterling, Illinois, testified at trial. He owns a repair store. Prior to January 8, 1992, Toumbs purchased a .380-caliber semiautomatic pistol that was manufactured by Jennings Bryco from a gun store called Merkels in Quincy,

Illinois. Sometime before January 8, 1992, Toumbs told a few people that he wanted to sell the gun. One of the people he told was Scott Bemis. He believes that Scott Bemis told the defendant that the gun was available. On January 8, 1992, the defendant came to his store. Toumbs testified that the defendant was an occasional customer of his store. He also knew the defendant from drag racing events, which was an interest that he and the defendant shared. The defendant said that he wanted to buy the gun. Toumbs prepared a paper including the serial number, confirmed that the defendant had a firearm owners identification card and included that number on the receipt, and he and the defendant both signed the sales receipt. John identified this original document, which was admitted into evidence. The gun he sold the defendant was in a blue box. On December 19, 2003, he turned the receipt over to the O'Fallon Police Department following a visit from an officer earlier that day. Toumbs testified that somehow, he came to the police department's attention because they learned that he had owned a .380-caliber pistol at one time.

¶ 44                                17. *Lieutenant Eric Van Hook*

¶ 45    On December 17, 2003, an O'Fallon Police Department officer, Lieutenant Eric Van Hook, along with Officer John Spanley, approached the defendant on the parking lot of his place of work, the Western Illinois Correctional Center, to ask if they could speak with him about a case. The defendant said that he would need to first speak with his attorney. The officers had a warrant to search the defendant's vehicle, although that fact was not immediately disclosed to the defendant. The officers did not read the defendant his constitutional rights pursuant to *Miranda v. Arizona* while on the parking lot. After speaking with his attorney, the defendant and the officers got into a vehicle and began traveling to the Mt. Sterling Police Department for the interview. Along the way, the defendant's attorney called and asked if the location of the interview could be changed from the police department to his law office. The officers agreed. During this ride, the defendant

11

was not handcuffed, and sat in the front seat. An officer drove the vehicle, and two other officers rode in the backseat. The defendant was not questioned during this commute. He was allowed two stops to use a restroom, and an officer purchased the defendant a soda to drink. Upon arrival at the defendant's attorney's office, the defendant and his attorney had a private conversation. Thereafter, the defendant requested immunity in exchange for agreeing to give the statement. Although the immunity request was denied, the defendant ultimately agreed to give a statement to the police, so long as the statement was recorded and done in the presence of his attorney. *Miranda* rights were read to the defendant before he gave his statement. The defendant acknowledged his understanding of those rights. The defendant's recorded statement lasted approximately 50 minutes. The officers offered the defendant a ride back home, but he denied that offer. During the defendant's interview, the police executed the search warrant for the defendant's vehicle.[1]

¶ 46                18. *Stipulation Regarding the Defendant's Truck Search*

¶ 47    At trial, the parties stipulated that nothing found and catalogued, during the December 18, 2003, search of the defendant's vehicle, was of evidentiary value for use in the defendant's trial.

¶ 48                19. *The Defendant's Taped December 17, 2003, Interview*

¶ 49    The defendant prefaced his interview with a statement to the effect that he wanted to contact the police before this interview to tell them what he knew, but he had not done so due to advice he received from his ex-wife, Dawn Ritchey, and his father-in-law, John Ritchey. During the videotaped statement, the defendant acknowledged that he was in the O'Fallon store on the date that Amy Blumberg was murdered. On that date, the defendant traveled to the area to go to

---

[1]Although Lieutenant Van Hook testified that the search of the defendant's vehicle was contemporaneous with the defendant's December 17, 2003, recorded interview, documents in the record on appeal indicate that the search of the vehicle did not occur until December 18, 2003, the date when the St. Clair County State's Attorney's Office obtained a search warrant.

an auto parts swap show in Collinsville. However, he never found the show, and ended up in the Fairview Heights/O'Fallon area. He traveled back onto eastbound Interstate 64 intending to go home but realized that he was going in the wrong direction. He exited the interstate in O'Fallon. He saw the dance store and thought that he could stop in there and purchase a black leotard for his daughter. He went into the store, made a purchase, and returned to the interstate. After several minutes, he began having second thoughts about his purchase—concern that the leotard would not fit. Because he did not live in that area, he would not likely be back to return or exchange the leotard. He then turned around and returned to O'Fallon with the intent of returning the item.

¶ 50    Upon parking his truck on the parking lot, he saw a young man in what he described as a track suit walk from the dance store towards his truck. He assumed that the man was going to talk to him, but instead, the man quickly passed by his truck. The defendant entered the store. He did not see the employee. He found some blood near a clothing rack, and out of concern for the employee, he began calling out to her and looking throughout the store. Upon entering a room in the store, he discovered her body. The defendant stated that when he found her body that there was nothing distinctive about the way in which the employee was dressed. He acknowledged touching her thigh and checking her body for a pulse. He determined that she was deceased. Fearing for his own safety, he fled the store and the O'Fallon area. He claimed that he did not know what to do. He did not have a mobile phone.

¶ 51    When he got home, he told his wife what happened, and the two of them tried to determine what he should do with this information. The defendant's father-in-law also was told about his experiences, and his father-in-law advised him to stay out the situation—essentially to say nothing.

13

¶ 52    The defendant spoke about various threats that were made by Dawn relative to their pending divorce. The divorce had become combative as the defendant stated that he had proof that Dawn committed child abuse. Dawn left him telephone messages advising him that if he did not act in a nicer manner towards her, she would have to go to the law enforcement authorities to tell them what the defendant knew about the murder and had not disclosed. Dawn allegedly told him that she would be contacting the O'Fallon police. The defendant stated that he had not spoken to any other members of law enforcement about the events of December 31, 1999, until this interview.

¶ 53                    20. *Emily Hea Buss's Videotaped Deposition Testimony*

¶ 54    During her deposition, Emily explained her medical condition. Emily was due soon to give birth, and she did not feel safe traveling to St. Clair County to testify at the trial. She was previously married to Joseph Hea with whom she had two children. They were neighbors of the defendant and Dawn for some time. The Heas moved away to a different home in Mt. Sterling in 2002. In 2003, she was aware that Dawn and the defendant were going through a divorce. The defendant stored some of his personal belongings in their home at this time.

¶ 55    Sometime in August 2003, the defendant spoke to Emily in her garage about the events of December 31, 1999. He prefaced his story to Emily as one that would "freak [her] out." He told her that he had been in O'Fallon and had stopped to buy his daughter a leotard at a dance store. He returned to the dance store after deciding that the leotard may not fit his daughter, but upon his return, he could not find the store clerk. He waited a considerable length of time, and ultimately decided to look for the clerk. He saw blood on the floor in an area by the cash register. The defendant searched through the store, ultimately finding the girl's body. He got scared and fled the scene. He had blood on his clothing and hands. He went to a convenience store where he washed his hands and threw away the leotard. He drove home and lied to Dawn about the source of blood

14

on his clothing, telling her that he struck an animal with his car. He also told Emily that he believed Dawn planned to blackmail him about his failure to go to the police.

¶ 56    Emily testified that she asked him what he planned to do about what he had witnessed and told him that he should talk to someone and clear his name.

¶ 57    The next day, Emily searched the internet without success for information about the murder.

¶ 58    Later in October 2003, just before Emily and her husband were to testify on his behalf at hearings about his divorce, the defendant told her that he had an appointment to meet with the O'Fallon police and his attorney. On October 10, 2003, right after Emily and her husband Joseph testified for the defendant, he told them that the night before he and his attorney met with O'Fallon police officers in his attorney's office and that he had been cleared. Having no reason to doubt this statement, Emily did not contact the police.

¶ 59    After this conversation, but before December 15, 2003, something happened that changed the nature of their friendship with the defendant. Emily testified that after the divorce hearing, some things the defendant told them did not match up with certain events. As a result, she and Joseph determined that his items needed to be removed from their home. Emily stated that they quietly severed ties with the defendant. When pressed, Emily testified that she "disagreed with how he handled some things."

¶ 60    On December 15, 2003, the police contacted her. Ultimately, Emily gave four interviews to the O'Fallon police about these conversations. Upon cross-examination, Emily admitted that she had conversed with her then-husband Joseph about the situation, but never about any substantive fact of the defendant's story. Instead, she characterized her conversations with her

15

husband as being in the realm of shock that someone they knew had been involved in this type of situation.

¶ 61                                   21. *Joseph Hea*

¶ 62     Joseph Hea, the defendant's former neighbor and friend, and the ex-husband of Emily Hea Buss, testified at trial. Sometime in 2000, he and the defendant had a conversation in which the defendant told Joseph that he had met a girl named Amy who looked a lot like Joseph's then wife, Emily.

¶ 63     In August 2003, the defendant called Joseph and asked to meet him at a bar. The defendant told his story of purchasing the leotard on December 31, 1999, and then deciding to return the leotard and finding the store clerk dead. Joseph testified that the defendant traveled to O'Fallon for a swap meet, but earlier had told police in an interview that he thought that the swap meet was a gun swap meet. Upon determining that the dance store employee was dead, the defendant explained to Joseph that he panicked and fled the scene. The defendant told him that he went to a convenience store to wash his hands to get the blood from his hands and arms. The defendant threw the bag containing the dance leotard in the convenience store trash can. At some point after fleeing the dance store crime scene, the defendant told Joseph that he threw a gun that he was carrying that day out the window of the truck. He got rid of the gun because he was in this state of panic.

¶ 64     At some point during this conversation in the bar, the topic of the weapon and the caliber of the weapon came up. The defendant stated that the weapon was a "throw-away" one. Joseph asked the defendant if it was a .45-caliber gun, and the defendant said that it was. The defendant told Joseph that the caliber of the gun he threw away on his way home matched the caliber of the gun used by Amy's murderer.

16

¶ 65    The defendant told Joseph that he drove home and told his wife that he had hit an animal resulting in the blood on his clothing.

¶ 66    The defendant told Joseph that Dawn was "blackmailing" him in the course of their divorce proceedings with the knowledge that the defendant had not gone to the authorities with the information he had.

¶ 67    Joseph testified that at this bar, after the defendant told his story, Joseph advised him to go to the authorities to tell them what he saw. Approximately one week later, Joseph testified that the defendant told him that he and his attorney had gone down to St. Clair County to file a report. The defendant told Joseph that the authorities were not terribly interested in the information he had about the crime.

¶ 68    Thereafter, the defendant and Joseph had a falling out in which Joseph and his wife Emily distanced themselves from Joseph relative to allegations apparently made by the defendant to third parties that Emily was having an extramarital affair.

¶ 69    Sometime in December 2003, Joseph had a conversation with Dawn about what he knew of the defendant's involvement at the O'Fallon crime scene. Dawn told Joseph that she was going to let the authorities know that the defendant also told Joseph about what happened. Approximately three days later, Joseph was contacted by the police on December 15, 2003, to inquire about the conversations he had with the defendant about the O'Fallon crime. By the time of the interviews, Joseph was no longer friendly with the defendant.

¶ 70    Joseph testified that the defendant and Dawn were both into guns—that buying and shooting guns was their hobby.

¶ 71                                    22. *John Hackman*

¶ 72    John Hackman, Emily Hea Buss's father, also testified at the trial. He resides in Jacksonville. He met the defendant in 1999 when Emily and her husband Joseph became neighbors with him. As time passed, he became friendly with the defendant due to shared interests. When the defendant was diagnosed with cancer, Hackman drove him numerous times down to the St. Peters, Missouri, location of Barnes Hospital for chemotherapy. He also accompanied the defendant on a trip to Wisconsin to obtain a drag racing engine.

¶ 73    In the fall of 2003, when the defendant and Dawn began the divorce process, the defendant began spending more time with John—frequently spending nights with Hackman in his home. During one of these visits, the defendant told him about the O'Fallon crime scene he encountered. During this conversation, the defendant told Hackman that he was fearful that Dawn was going to tell the authorities what she knew.

¶ 74    The defendant told Hackman that he went down to the area on December 31, 1999, to go to a swap meet gun show. Unable to find the swap meet, he ended up in a store at which he purchased an article of clothing for one of his daughters. He told Hackman that he decided to return the item, and upon arrival back at the store, saw a man running out of the store wearing a coat and a stocking cap. He discovered the store clerk's body in the store. The defendant told Hackman that he rolled the girl's body over to check for a pulse. He told Hackman that the girl had been shot in the head. The defendant fled the scene. He told Hackman that the reason he ran was because he had an unregistered handgun with him, and he was afraid to be caught with it. Somewhere on the way home from O'Fallon, he disposed of the gun. When he got home, he told Dawn that he hit a deer. When she began to try to get the stain out of the pants and noticed that there was more blood

18

there than what she would have expected, Dawn was able to get the defendant to tell her the full story.

¶ 75    Hackman testified that for two to four weeks, he tried to get the defendant to contact police. Finally in October 2003, when John and the defendant were at a racetrack, the defendant told Hackman that he and his attorney had an appointment with O'Fallon detectives. The day after the alleged meeting, Hackman contacted the defendant to find out how it went. The defendant told him that the meeting was fine and that the detectives advised him that he was uninvolved in the case. Eventually that fall of 2003, the friendship between Hackman and the defendant began to wane. After the divorce, Hackman went to Dawn's home to apologize to Dawn for taking the defendant's side during the divorce proceedings. The topic turned to the events of December 31, 1999. While at Dawn's home, Dawn told Hackman what the defendant had told her about his involvement in the case. Dawn told Hackman that the defendant bought the gun that he threw away at a swap meet. The defendant allegedly told Dawn that he took the gun with him to the swap meet because he was carrying $300 in cash.

¶ 76    Ultimately, the police interviewed Hackman in December 2003 and again in January 2004 due to technical difficulties with the recording in December 2003.

¶ 77    In Hackman's testimony, he stated that while he spoke with Dawn about the defendant's story prior to the police interview, nothing that he would have told the police officers changed because the stories that the defendant told him and told Dawn matched. Hackman acknowledged reading newspaper articles about the crime. John also acknowledged that he and his daughter Emily and son-in-law Joseph talked about the defendant from time to time, but not exclusively about this case because there were many things going on with the defendant at the time.

19

¶ 78                                23. *James Ritchey*

¶ 79     James Ritchey is Dawn Ritchey's father. He testified that his daughter had been married to the defendant for approximately 10 years. He socialized with the defendant during his daughter's marriage. He confirmed that the defendant and his daughter both enjoyed owning and using guns. He testified that the defendant bought his daughter a .380-caliber inexpensive pistol, and that the defendant possibly had another .380-caliber gun as well.

¶ 80     In early January 2000, the defendant and Dawn came to speak with him in his home in Macomb. The defendant proceeded to tell the story of what he witnessed on December 31, 1999. The defendant told James that Amy Blumberg had been shot in the head. James Ritchey denied ever telling the defendant to stay out of the case, or to not get involved. To the contrary, James told the defendant that he needed to get in contact with the O'Fallon Police Department to tell them what he saw. He also confirmed that his daughter Dawn did not ever, in his presence, tell the defendant to stay out of the matter and/or to tell no one of what he witnessed.

¶ 81     At some point in the fall of 2003, after the divorce process had begun, O'Fallon detectives contacted him. At their request, he participated in a taped phone call to the defendant to attempt to get his acknowledgment that he had purchased Dawn a .380-caliber handgun. The defendant denied doing so and told James that he bought her a .22-caliber gun.

¶ 82     James denied ever reading newspaper articles about the crime.

¶ 83                                24. *Dawn Ritchey*

¶ 84     Dawn Ritchey testified that she married the defendant in 1993, and two daughters were born during the marriage. The children were five and three in December 1999. Dawn has been employed with the Illinois Department of Corrections throughout her career. Currently, Dawn is a parole agent. Prior to that, she was a correctional counselor within the Western Illinois

20

Correctional Center. The defendant was a maintenance equipment operator for the Department of Corrections and drove a truck delivering meat to all the State's prisons. Dawn testified that both she and the defendant were firearms enthusiasts.

¶ 85    On the morning of December 31, 1999, the defendant left the home wearing a dark brown leather bomber jacket she gave to him that Christmas as a present. He was also carrying a small black triangular-shaped case in which they kept a small gun—a .380-caliber. Dawn explained that she knew that the defendant was carrying the .380-caliber gun that date because it was the only gun that they owned that would fit into that case. Dawn testified that the defendant bought the gun for her. Her understanding was that the gun was purchased at a gun show in 1996 or 1997.

¶ 86    Later that night, the defendant came home at somewhere between 5 and 6:30 p.m. Dawn testified that the defendant came in and walked straight upstairs. He was not wearing his leather bomber jacket. She noticed that there was something on his jeans from the knees on down. She described the substance as being more than a mere splatter, but less than being soaked. Dawn testified that she asked the defendant what that was on his pants. The defendant told her that it was blood from an animal that he had to drag off the road. Later, Dawn saw the pants again—in the trash can in their bathroom.

¶ 87    That night, the defendant had to work because it was the New Year's Eve of the year 2000, and officials were concerned that there could be Y2K outages, necessitating the delivery of things to the prisons within the system. He got home at around 2 a.m.

¶ 88    The next day, the defendant slept in. Dawn described this as unusual as the defendant always got up early in the morning. At around 1 p.m., she carried lunch into the bedroom for the defendant. Dawn stated that she could tell that there was something wrong and asked the defendant. The defendant proceeded to tell his story. He told Dawn that he had witnessed something that

21

really bothered him, and that he could not get the images out of his mind when he tried to sleep. He told Dawn that he had intended to go to the gun show on December 31, 1999, but that he was unable to locate the show. He returned to a convenience store where he had seen the flyer with the plans of re-reading the flyer, only to discover that the flyer was now gone. As he returned to his car, he saw a dance clothing store, and decided to go over to purchase an outfit for their daughter. Dawn testified that this would have been unusual because Dawn bought not only all dance apparel for their daughter, but she purchased all clothing for both daughters. She could not recall any instance where the defendant bought clothing for their daughters. Shortly after the purchase, the defendant returned to the store with the intention of returning the outfit. He then encountered a man running from the store. This man had a duffel bag and was wearing a track suit. The defendant told Dawn that he thought that the man was coming straight towards him, and so the defendant reached for the gun that he had with him. However, when the defendant looked up, the man was gone. The defendant then entered the store with the outfit. He saw no one. He called out but got no response. The defendant told Dawn that he saw blood behind the counter and followed a trail that led to a backroom in the store where he found the girl's body. The defendant knelt to check the girl's pulse in her neck. He explained to Dawn that this is how he got blood on his pants. He told Dawn that the girl's pants were pulled down. Dawn was unable to remember if the defendant told her that the pants were pulled down to her knees or to her ankles. Upon determining that the girl was dead, the defendant told Dawn that he got scared and left the store, stating that he feared that he had left prints on the door.

¶ 89     A couple of days later, she and the defendant went to Quincy to look in newspapers to see if there was a description of the man the defendant said he saw leaving the store. In a *St. Louis*

22

*Post-Dispatch* article (that she believed was dated sometime between January 1 through January 4, 2000), Dawn recalled that the police investigators were looking for a six-foot-tall blond man.

¶ 90    Shortly after looking in the newspapers, Dawn and the defendant went to her dad's home. The defendant told her dad the same story, also explaining that the reason he did not call anyone was because he was afraid that they would think that he committed the crime. Dawn testified that her dad told the defendant that he should call the police anyway. Dawn also encouraged the defendant to do so, telling the defendant that at a minimum he should call the CrimeStoppers hotline with his tip. Her dad never told the defendant to stay out of the case. Dawn testified that she never told the defendant to stay out of the case. Dawn testified that she continued to encourage his reporting, but due to life circumstances in their own home, Dawn testified that sadly, she somewhat forgot about the murder.

¶ 91    In 2002, the defendant was diagnosed with colon cancer. He had surgery and six to eight months of chemotherapy. Dawn testified that they all focused on the defendant's recovery.

¶ 92    Dawn testified that she never thought that the defendant was lying to her, or that he was in any way involved in the murder of Amy Blumberg.

¶ 93    At the end of July in 2003, the defendant accused Dawn of having an affair with a man in the area where they lived. She moved out of the home, taking the two girls with her, and filed for divorce. Dawn described the divorce process as not amicable. Dawn acknowledged that after the defendant began an attempt to obtain sole custody of their daughters, she called him and left a voicemail to the effect that if he continued to do these things, she would have no choice but to tell the court about the crime he failed to report. The morning after she left this voicemail, Dawn was visited at work by the defendant and his mother to discuss the divorce.

23

¶ 94　A prison employee who worked with Dawn, and whom Dawn had told about her husband's story, located the St. Clair County Sheriff's Department website and read the information about the unsolved crime. Dawn's friend felt that what she read was important and asked Dawn to look at the information. On the website, there were two composite drawings. Dawn agreed with her coworker that one of the drawings, coupled with the description of the man that the O'Fallon police were looking for, matched the defendant. Her friend advised that if Dawn would not call the police, then she would. Dawn then went to see her divorce attorney and told him the full story. Prior to that time, she had only told her attorney that she had information that the defendant failed to report a crime. Dawn had not previously told her attorney the specifics of the incident. Her attorney called the O'Fallon Police Department on September 19, 2003.

¶ 95　On September 20, 2003, Officer Spanley drove to the home of Dawn's divorce attorney to interview her. Dawn testified that she, the attorney, and the officer did not discuss the facts of the case before she gave her recorded statement.

¶ 96　The court entered dissolution of the Phillips' marriage on December 15, 2003, reserving all decisions relative to child custody, visitation, and property distribution.

¶ 97　On December 17, 2003, the police returned to Mount Sterling and stopped at her home to ask if they could search the premises. Dawn signed a consent for the search and then showed the officers around the property. One of the places that the officers searched was in the attic. Dawn testified that while the parties were by then divorced, not all of the defendant's things had been removed from the home. She testified that the attic space had essentially been divided with her things on one side and the defendant's things on the other side. The officers searched through the defendant's items and located a cardboard box for a .380-caliber gun. Dawn testified that she did not remember ever seeing this box before. On cross-examination, she explained that the .380-

24

caliber gun was a gift from the defendant to her, and when he gave it to her, it was not in a cardboard box.

¶ 98    Dawn testified that the .380-caliber gun was never registered.

¶ 99    She claimed that when she left that phone message for the defendant that she was not attempting to get the upper hand in the divorce proceedings. At trial, the defendant's attorneys played Dawn a tape-recorded message that they contended was her threat to the defendant. Dawn testified that she really did not believe that this was her voice on the tape. The voice did not sound like her voice, and the speaker on the tape used words in the message that Dawn would never use.

¶ 100   Dawn testified that the defendant had visitation with his children until he was arrested in December 2003. Ultimately, she was awarded custody of their two girls, and was awarded the house in the property settlement.

¶ 101   Dawn testified that she and the defendant had been down in the metro-east area of St. Louis several times before December 31, 1999.

¶ 102   When asked why she never called the police herself after she learned what the defendant witnessed, she testified that she believed her husband. However, after looking online at the composite drawing and accompanying description, coupled with the defendant's behavior after she filed for divorce, Dawn testified that she felt compelled to provide the information that she had.

¶ 103   Dawn acknowledged that someone told her that there was a $20,000 reward for information about Amy's murder, but this person also reminded Dawn that as employees of the Department of Corrections, they were ineligible for an award.

¶ 104                        25. *Doris Lehne*

¶ 105   The defendant's mother, Doris Lehne, testified at trial. She was a tax accountant and had lived in Mt. Sterling, Illinois, since 1964. She testified that the defendant had worn facial hair—a moustache and goatee from approximately 1997 through 2003. After the divorce proceedings began, she suggested to the defendant that he shave his facial hair because he was going to be making court appearances. Doris testified that the defendant and Dawn had many mutual hobbies, including guns. She testified that the defendant was unaware that Dawn was going to leave him and got home on that day to find that most of her personal possessions had been removed. She described the marriage as a good one up until that point and testified that the defendant adored his two daughters.

¶ 106                   26. *Vehicle Sightings Testimony at Trial*

¶ 107   All of the witnesses provided information about vehicles that they saw in the vicinity of the store and/or on the parking lot of the store on December 31, 1999.

¶ 108   David Delano testified that he saw a 1980s Dodge Chrysler vehicle driving at a high rate of speed at 4:25 p.m.

¶ 109   Paul Levins testified that at 4 p.m., and later at 4:50 p.m., he saw three vehicles on the parking lot—a dark maroon sedan, a 1970s muscle car, and a third vehicle that he could not remember.

¶ 110   Janet Channel testified that between 5:10 and 5:20 p.m., a 1950s or 1960s dark-colored vehicle with rust on it, cut her off as she was driving on Highway 50 near the store.

¶ 111   Lisa Karius testified that between 3 and 5 p.m., she saw a black Chevrolet Cavalier, a white car, and a pickup truck on the parking lot.

¶ 112   Victoria Dickerson testified that between 3:30 and 4 p.m., she saw an older, boxy gray car drive away from the area. At about the same time, she saw a man standing on the parking lot.

¶ 113   Marilyn Cox testified that at about 4:15 p.m. and at 5:15 p.m., she saw an old, rusted car on the parking lot. She believed that the car was an old 1960s powder blue Thunderbird.

¶ 114   A stipulation was read that James Miller would testify that between 6:30 and 6:45 p.m., he saw a black Chevy S-10 pickup truck parked on the parking lot.

¶ 115           27. *Other Possible Suspects Presented in the Defendant's Case at Trial*

¶ 116   A man by the name of Thomas Boger testified that on December 31, 1999, at around 1:30 p.m., a car drove up behind him flashing its lights and driving erratically. Thomas stopped. The driver—a young white male with blond hair—wanted directions to the Sports Authority store in Fairview Heights. Later, at about 3 p.m., he saw the same man in his car on the parking lot of the Sports Authority, and he had a revolver in his hands.

¶ 117   Officer Spanley was with the O'Fallon Police Department at the time of this crime and during its investigation. He testified to the various leads and suspects received by law enforcement agencies about this crime.

¶ 118   The O'Fallon Police Department obtained fingerprints from many different people, including Amy's boyfriend, Jody Woods. When the detectives from the major case squad arrived at the apartment where Jody lived, he was found hiding in a closet. Jody drives a Chevy S-10 pickup truck.

¶ 119   A man by the name of John Sprous was seriously considered as a suspect. The information leading to Sprous was overheard by a fellow inmate of Sprous's who wanted a transfer to another prison. This inmate is John Little. Little and his roommate were in fact transferred to the prison of choice. Officer Spanley's investigation revealed that Sprous was out on parole on December 31,

1999. At the time that he became a suspect, he was in prison in Missouri for robbing and killing a store clerk. They cross-checked his fingerprints against what was recovered at the scene and there were no matches. Officer Spanley confirmed that all St. Louis media, which heavily covered this murder and the investigation, was carried into the Potosi, Missouri, correctional facility where Little was then housed. Although there were five other inmates involved in the conversation overhead by Little through an air vent, none of these five inmates was interviewed.

¶ 120 Little testified at trial that he was serving a life sentence in Missouri. Little heard the conversation on January 19, 2002. Little testified that the men were looking at a magazine and that Sprous allegedly stated that the photo of a woman in the magazine looked like a girl he had killed in Illinois. Sprous allegedly claimed that he got off the interstate and went to a service station. He saw the victim through the window of a store. His alleged plan was to rape the woman, but then because he saw a taxicab or a police car out the front door of the store, he determined that it was necessary to kill the woman. He allegedly claimed to have moved her body to another area of the store before returning to St. Louis.

¶ 121                    28. *Defense Expert, Brent Turvey*

¶ 122 Brent Turvey is a forensic scientist and criminal profiler. He is an adjunct professor of criminality at Oklahoma City University. Professor Turvey was asked to review materials related to this case. He reviewed an FBI profile prepared in this case, the crime scene and autopsy photographs, the crime scene video, crime scene sketches, several crime scene reports, the coroner's report, the O'Fallon Police Department investigative reports and evidence logs, the St. Louis Major Case Squad investigative reports, the Illinois State Police forensic reports and evidence logs that involved biology, firearms, and latent prints. He prepared a written report for

28

the defense dated December 6, 2006, based upon his review of these documents along with his expertise.

¶ 123 In his review, Professor Turvey found several deficiencies in the processing of the crime scene. He testified to what he characterized as a very limited effort on the part of the investigators to document, collect, or search for evidence outside of the building. No attempt to determine the point of entry or exit from the building was done. He took issue with the fact that a police vehicle was parked by the front door of the store. By parking the official vehicle there, Professor Turvey testified that critical evidence could have been contaminated or destroyed. He testified that the police vehicle could have been parked on top of evidence that could have pointed to the criminal offender's point(s) of entry and exit. About entry to and exit from the store, Professor Turvey testified that the investigation did not seem to include a search for bloodstains or blood trails outside of the store. He felt that the police should have processed Amy's vehicle for any sort of evidence relative to the crime. Professor Turvey also testified that the police investigation was deficient because there was no attempt to locate the high velocity bloodstain pattern typically associated with a gunshot wound, which could provide detail as to exactly where Amy was when she was shot.

¶ 124 Professor Turvey rendered additional opinions at trial about the evidence, in addition to those detailed opinions as to deficiencies in the processing of the crime scene. Although Amy's body sustained bruising consistent with a struggle, he felt that she was not in a lengthy struggle because her fingernails were not broken. He also testified to his opinion that the crime scene was staged to look like a sexual assault. He defined staging as something a criminal offender might do to mislead the investigation by altering the crime scene to make it appear to be something other than what occurred. He further explained this by testifying that Amy's body was dragged into the

29

restroom, and her legs were spread apart, but the evidence failed to support any effort on the part of the offender to attain sexual gratification. He testified that had any sexual activity transpired, blood would have been transferred to the genital area. As there was no blood in that area of her body, Professor Turvey testified that in his opinion, the crime scene was staged to look like a sexual assault. On cross-examination, he admitted that he could not rule out a sexual motivation for the crime in this case.

¶ 125                                B. Jury Deliberations and Verdict

¶ 126   The jury began deliberating at 1 p.m. on April 11, 2007.

¶ 127   At 1:30 p.m., the jury asked if they could watch the defendant's videotaped statement. The defendant objected to this because the defendant referred to an order of protection during the interview. The defendant's objection was overruled, and the jury was allowed to watch the statement a second time.

¶ 128   At about 9 p.m. on April 11, 2007, the defendant's attorneys went to the court with the information that the videotape of Emily Hea Buss had been heard being played in the juror deliberation room. The defendant was under the belief that this tape was not going back with the jury. The defendant had agreed to this exhibit being allowed to go back with the jury, but the defendant's argument was that this was not merely an exhibit but was testimony. On that basis, the defendant asked for a mistrial. The court denied the mistrial request.

¶ 129   At 10:37 p.m., the jurors sent out a note seeking a night recess. The defendant asked for the jury to be sequestered. The court denied the request.

¶ 130   On April 12, 2007, at 2:52 p.m., the jury sent out a note indicating that the jurors were at an impasse. The court sent back a note asking the jurors to continue their deliberations. The jury

then requested and received transcripts of the testimony of Dawn Ritchey, Joseph Hea, John Hackman, and James Ritchey.

¶ 131   On April 13, 2007, at 5 p.m., the jury returned with its guilty verdict.

¶ 132                              C. Posttrial Motions and Sentencing

¶ 133   The defendant filed a motion for a new trial on May 14, 2007, as well as other related motions. The motions were set for hearing on the same date as sentencing—May 29, 2007. The trial court denied the motions.

¶ 134   The defendant was sentenced to 55 years of imprisonment.

¶ 135                              D. Direct Appeal

¶ 136   On direct appeal, the defendant raised the following issues:

(1) violation of his speedy trial rights;

(2) unconstitutional delay before his first appearance in court;

(3) no provision of funds to provide for expert witnesses and investigative services after the defendant retained private counsel;

(4) denial of his motion for a bill of particulars;

(5) denial of his motion for additional discovery;

(6) denial of his motion to suppress his videotaped statement to the police;

(7) violation of an *in limine* order and denial of his mistrial requests;

(8) allowance of a witness's testimony by videotaped deposition;

(9) granting the State's *in limine* order that precluded the defendant from referencing or using two additional taped conversations he had with police;

(10) alleged inappropriate contact between the jury and court personnel during deliberations;

(11) failure to redact the defendant's videotaped statement to the police;

(12) failure to send transcripts of defense witnesses to the jury;

31

(13) the court's *voir dire* reference to the case as being "high profile";

(14) the cumulative effect of the court's rulings that denied the defendant a fair trial;

(15) failure to prove the defendant's guilt beyond a reasonable doubt; and

(16) claimed violation of the defendant's statutory right to a DNA database search.

As stated earlier in this order, this court affirmed the trial court. *Phillips*, 2011 IL App (5th) 070416-U. The Illinois Supreme Court denied the defendant's petition for leave to appeal from this order on May 30, 2012.

¶ 137                     D. Postconviction Petition, Motions, and Trial Court's Ruling

¶ 138 On February 27, 2013, an attorney representing the defendant filed a postconviction petition. The defendant raised the following six claims alleging ineffectiveness of both trial and appellate counsel:

> (1) trial counsel was ineffective for failing to assert the defendant's marital privilege to prevent his wife from testifying to statements he allegedly made to her;
>
> (2) trial counsel was ineffective for failing to ask the trial court to inform the jury that it was not permitted to consider evidence of the order of protection against him;
>
> (3) trial counsel was ineffective for failing to seek testing of hair fibers and fingerprints found at the scene of the crime to see if they matched the profiles of potential other suspects;
>
> (4) trial counsel was ineffective for failing to investigate and present evidence with which to impeach the defendant's ex-wife, Dawn Ritchey;
>
> (5) trial counsel was ineffective due to a personal disagreement he had with the defendant after which trial counsel informed the defendant that he would not vigorously defend him; and
>
> (6) appellate counsel was ineffective for failing to raise the first three claims included in this list.

¶ 139 Postconviction counsel attached the defendant's affidavit to the postconviction petition. He alleged that his ex-wife's trial testimony contained several false statements. He stated that he did

not tell Dawn that the blood on his pants came from a dead animal that he drug off the road; that he told her upon his arrival home about discovering Amy Blumberg's body; that he did not tell her he was going to a gun show, but told her he was going to an auto parts swap show; that he never told her that Amy Blumberg had her pants pulled down around her knees or ankle; that he did not go to the police because Dawn and her father told him not to do so; that he did not have a case for a .380-caliber gun when he left home on December 31, 1999; that Dawn threw away the blood-stained pants; and that he was wearing his brown jacket when he arrived home. The defendant also stated that on September 22, 2003, when the court held its hearing on Dawn's order of protection petition, Dawn informed the Brown County courthouse personnel that the defendant was bringing a gun to the hearing. The defendant contends that Dawn's statement about the gun to the courthouse personnel was inconsistent with her testimony that she had not seen the defendant's .380-caliber gun since the date of the murder. The defendant claims that his attorney should have attempted to interview the deputy sheriff involved in the courthouse encounter to impeach Dawn's testimony.

¶ 140   On May 28, 2013, the trial court reviewed the petition for postconviction relief and gave the State 30 days to file a responsive pleading. With the trial court's order directing the State to file a responsive pleading, the trial court seemingly advanced the postconviction petition to the second stage, implicitly finding that the petition stated the gist of a constitutional claim. The State filed a motion to dismiss the postconviction petition on June 25, 2013. The State argued that the defendant waived his marital privilege, and that the statements he made to third parties in which he repeated what he had told Dawn was largely consistent. Furthermore, the State contended that the admission of Dawn's testimony did not fundamentally impact the fairness of the defendant's trial because of the number of other witnesses who testified that the defendant told them the same

33

version of events. Accordingly, the State claimed that the outcome of the trial would not have been different, and that the defendant could not meet the standard required by *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Moreover, the State suggested that Dawn's testimony and status as the defendant's ex-wife served as the foundation for his defense—that he was the victim of his bitter and vindictive wife who threatened him to achieve a better divorce settlement. The State also argued that the defendant suffered no prejudice when two witnesses made a passing reference to the order of protection against the defendant. The State argued that to the extent that some of the postconviction allegations were raised in the defendant's direct appeal, the allegations were barred by *res judicata*. The State argued that the defense legal strategy was to use the lack of DNA testing as being consistent with shoddy police work and contended that defense counsel chose not to pursue DNA testing. The State also contended that the defendant's argument that his trial counsel did not provide a vigorous defense was refuted by the record. Finally, the State argued that because the defendant's arguments were without merit, appellate counsel could not have provided ineffective assistance.

¶ 141 Between 2012 and 2017, the record contains numerous motions and appeals filed by the defendant. Additionally, the Illinois Innocence Project worked with this case to procure DNA testing. During those years, the defendant filed two *pro se* petitions for relief from judgment pursuant to section 2-1401(f) of the Code of Civil Procedure. 735 ILCS 5/2-1401(f) (West 2012). The defendant filed the first petition on February 27, 2013, and filed a successive petition on August 26, 2013. The trial court dismissed the successive petition on October 2, 2013. Then on March 17, 2014, the defendant filed a *pro se* document with the court purporting to supplement the February 27, 2013, initial section 2-1401(f) petition. The court granted the motion to supplement on May 28, 2014, and then denied the February 27, 2013, section 2-1401(f) petition.

34

The defendant appealed the court's May 28, 2014, dismissal to this court, and the appeal was designated with the court number 5-14-0281. On February 19, 2015, this court entered its written order and affirmed the trial court's denial of the defendant's section 2-1401(f) petition as being untimely and barred by *res judicata. People v. Phillips*, 2015 IL App (5th) 140281-U.

¶ 142 On June 19, 2014, the defendant filed a *pro se* "Second Petition for Post Conviction Relief." He asked the court to grant him leave to file the petition. On June 24, 2014, the trial court denied the defendant's request for leave to file the successive petition and dismissed the successive petition. The trial court found that the defendant's allegations did not present a gist of a constitutional violation. The defendant then filed a notice of appeal from that order on July 7, 2014, to this court, and the appeal was designated with the court number, 5-14-0347. On July 21, 2017, this court entered its written order and dismissed the appeal on the defendant's own motion.

¶ 143 On September 8, 2015, the parties entered an agreed order for postconviction DNA testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2014)). The order was amended on December 9, 2015.

¶ 144 On September 14, 2017, the defendant, by his attorney, asked for leave of court to file an amendment to the February 27, 2013, postconviction petition. The trial court granted the defendant's request. On February 5, 2018, the defendant filed his addendum to the postconviction petition. In this addendum, he argued that the State denied him due process by failing to disclose a voicemail message Dawn Ritchey left on his cell phone that would have significantly impeached her trial testimony. The police had obtained a tape recording of the message, but the recording was not disclosed to the defense before trial. The recording had been created by the defendant and was on a cassette tape labeled as "Dawn's blackmail phone calls." The tape was collected pursuant to a search warrant pertaining to the defendant's truck on December 18, 2003. The defendant claimed

35

that he informed his attorney that there was a second recording from Dawn and that the police had the only copy. The defendant thus claims that his trial attorney was ineffective for failing to request this message in discovery. Further, the defendant argues that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), in that the tape recording was favorable to the defense of his case and had not been disclosed.

¶ 145   On February 5, 2018, the defendant's attorney filed his certificate in compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 146   The State filed an amended motion to dismiss the postconviction petition on February 28, 2018. In addition to the arguments made in its initial motion to dismiss, the State addressed the *Brady* issue. The State indicates that the defendant is not arguing that the failure to provide defense counsel with the additional voicemail from Dawn was intentional. However, regardless of intent, the State argues that this evidence was not material when evaluated in the context of the entire record in that there was no reasonable probability that the outcome would have been different if the State provided the recording of the second call to the defendant. The State pointed out that the defendant's attorney thoroughly cross-examined Dawn about these recorded "threats." Dawn acknowledged that she left voicemails that could be characterized as threatening in nature. Moreover, the State noted that the jury heard the defendant's recorded interview with police in which he stated that Dawn had been threatening him.

¶ 147   On March 20, 2018, the trial court held the hearing on the State's motion to dismiss the defendant's postconviction claim. After a lengthy argument by both parties, the trial court took the matter under advisement and concluded the hearing. On June 7, 2018, the trial court entered its order granting the State's motion to dismiss the defendant's postconviction petition. The trial court referenced this court's order on direct appeal (*Phillips*, 2011 IL App (5th) 070416-U), stating that

the order was thorough. The court stated that the many issues included in the defendant's postconviction petition were previously addressed in that appellate order. The court further concluded that to the extent that the issues were not reviewed in the appellate court on direct appeal, the defendant could have raised those issues on direct appeal. The trial court dismissed the postconviction petition on all issues raised on the grounds of *res judicata*. From that final order, the defendant timely appealed.

¶ 148                                   II. ANALYSIS

¶ 149   On appeal, the defendant claims that the trial court erred in dismissing his postconviction petition, and claims that postconviction counsel provided ineffective assistance.

¶ 150   An individual who has been convicted and is serving an Illinois criminal sentence can file a petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)) to allege that their Illinois and federal constitutional rights were denied. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). A proceeding under the Post-Conviction Hearing Act has three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418-19 (1996). Here, the defendant did not file his postconviction petition on a *pro se* basis, but his attorney filed the petition on his behalf. Later his attorney added more claims via an addendum. Thus, the presentation of this postconviction appeal is slightly different in that the defendant had representation at the first stage. The postconviction court implicitly determined that the petition stated the gist of a constitutional claim when it ordered the State to file a responsive pleading. 725 ILCS 5/122-5 (West 2010). Thereafter, in this second stage, the postconviction court must determine if the defendant has made a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). The postconviction court must accept all well-pleaded factual allegations as true, and the court must not engage in any fact-finding or credibility determinations. *Coleman*, 183 Ill. 2d at 385. The trial court must dismiss the

37

petition if the defendant has not made the required substantial showing. *People v. Ward*, 187 Ill. 2d 249, 255 (1999). The postconviction court will hold an evidentiary hearing if the defendant gets past this second stage to the third stage. 725 ILCS 5/122-6 (West 2010).

¶ 151    On appeal, we review a trial court's dismissal of a postconviction petition on a *de novo* basis. *People v. Hopkins*, 2020 IL App (3d) 170253, ¶ 15. With *de novo* review, this court does not have to defer to the trial court's judgment or reasoning and utilizes the same analysis as the trial court. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68. The reviewing court may affirm a trial court's dismissal of a postconviction petition on any basis supported by the record. *Id.* ¶ 69; *Hopkins*, 2020 IL App (3d) 170253, ¶ 15.

¶ 152    A postconviction petition is considered a collateral attack on the trial court proceedings. Therefore, "issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not [raised] are forfeited." *People v. Tate*, 2012 IL 112214, ¶ 8. Thus, if the defendant did not raise claims that trial counsel was ineffective on direct appeal, those claims have not been preserved for review. See *People v. Pendleton*, 223 Ill. 2d 458, 476 (2006). However, these types of claims would be appropriate for a successive postconviction petition in which the defendant would need to establish cause for failing to raise the error in earlier proceedings and prejudice resulting from the alleged error. See *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002); 725 ILCS 5/122-1(f) (West 2010); *Pendleton*, 223 Ill. 2d at 476.

¶ 153    In this case, the defendant argues that none of the issues raised in this postconviction petition were raised on direct appeal, and thus, the claims are not barred by *res judicata*. As the claims could have been raised on direct appeal, the defendant frames his claims as involving ineffective assistance of trial and appellate counsel, and thus, these claims would not be barred by forfeiture. The problem with the defendant's argument is that the underlying issues in these

ineffective assistance claims (1) were discussed and rejected by this court on direct appeal, albeit in different presentations, (2) could have been raised on direct appeal, or (3) the defendant was not prejudiced.

¶ 154   Before we address the specific issues raised by the defendant, we briefly review the standards required to establish ineffective assistance of counsel. The United States Constitution and the Illinois Constitution both guarantee a defendant the right to effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The purpose of the constitutional guarantees is to ensure a fair trial. *Strickland*, 466 U.S. at 684-85. Constitutionally competent assistance is measured by a test of whether the defendant received "reasonably effective assistance." *Id*. at 687. We presume that defense attorneys pursue sound trial strategies. See *id.* at 689. Trial strategies are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997).

¶ 155   A criminal defendant is entitled to the effective assistance of trial counsel at all critical stages of the case. *People v. Brown*, 2017 IL 121681, ¶ 25. To prevail on an ineffective assistance claim, "[the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Lefler*, 294 Ill. App. 3d 305, 311 (1998) (citing *Strickland*, 466 U.S. at 694). The term "reasonable probability" has been defined to mean "a probability sufficient to undermine confidence in trial's outcome." *Id.* at 311-12 (citing *Strickland*, 466 U.S. at 687). The fact that professional errors have been committed does not define the question. We must examine the issue from the perspective of whether the defendant received a fair trial, despite an attorney's shortcomings. *Id.* at 312. In that context, a fair trial means "a trial resulting in a verdict worthy of confidence." *Id.* (citing *People v. Moore*, 279 Ill. App. 3d 152 (1996)).

¶ 156 Similarly, a criminal defendant is entitled to the effective assistance of appellate counsel. The defendant must overcome the strong presumption that appellate counsel's decision not to raise a particular issue constituted sound appellate strategy. *People v. Coleman*, 2011 IL App (1st) 091005, ¶ 44. "Appellate counsel is not required to raise issues that he reasonably determines are not meritorious." *People v. English*, 2013 IL 112890, ¶ 34 (citing *People v. Collins*, 153 Ill. 2d 130 (1992)). Nor is it "incompetence for counsel to refrain from raising issues that counsel believes are without merit." *People v. Edwards*, 195 Ill. 2d 142, 163-64 (2001). "[U]nless the underlying issue is meritorious, a defendant cannot be said to have incurred any prejudice from counsel's failure to raise the particular issue on appeal." *Id.* at 164 (citing *People v. Childress*, 191 Ill. 2d 168, 175 (2000)).

¶ 157                                A. Marital Privilege

¶ 158 The defendant argues that he made a substantial showing of a constitutional violation because his trial attorney provided ineffective assistance by failing to assert his marital privilege against his ex-wife, Dawn Ritchey. In Dawn's trial testimony, she contradicted portions of the defendant's recorded statement which he argues "depicted him as someone who lied about what transpired."

¶ 159 The statute in effect at the time of the defendant's trial stated: "In criminal cases, husband and wife may testify for or against each other. Neither, however, may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage ***." 725 ILCS 5/115-16 (West 2002). The statute contained various exceptions that are not applicable in this case.

¶ 160 The foundation for marital privilege is based upon the preservation of family and marital harmony. *People v. Hall*, 194 Ill. 2d 305, 336 (2000); *People v. Eveans*, 277 Ill. App. 3d 36, 44

40

(1996). Further, there is a presumption that all interspousal communications are intended to be confidential. *People v. Murphy*, 241 Ill. App. 3d 918, 925 (1992).

¶ 161  The defendant contends that if Dawn had been barred from testifying about communications he had with her before they divorced, there would have been no testimony that when he saw the victim's body, her pants were pulled down to her knees or ankles, that he got blood on his pants by kneeling in blood, and that he had slept in on January 1, 2000. In addition, if the court had barred Dawn from testifying about matters subject to marital privilege, she would not have been able to corroborate the testimony of other witnesses who had spoken with the defendant.

¶ 162  In this court's order on the defendant's direct appeal, the defendant's presentation of the marital privilege issue was different than the presentation in this postconviction appeal. In his direct appeal, the defendant argued that his statement to police should be suppressed because the statement request was derived from information Dawn provided the police. We reviewed the issue and concluded that Dawn's statements provided to police were not protected by marital privilege because her statements were not testimonial in nature. *Phillips*, 2011 IL App (5th) 070416-U, ¶ 179. We noted that "[t]he the defendant's wife did not testify about conversations she had with the defendant. She was interviewed about these conversations, but the statute—and therefore, the privilege—extends only to testimony under oath." *Id.*

¶ 163  In his postconviction petition, the defendant argues that his trial counsel was ineffective for failing to assert the marital privilege to keep Dawn from testifying at trial, and that his appellate counsel was ineffective for failing to raise trial counsel's failure to assert the marital privilege. While we agree with the State that the general issue of marital privilege was raised on direct appeal

41

in the context of the trial court's denial of the defendant's motion to suppress, the legal context was different because Dawn's trial testimony was not directly at issue.

¶ 164    A postconviction petition is a collateral attack on the trial court proceedings, and therefore "issues raised and decided on direct appeal are barred by *res judicata*." *Tate*, 2012 IL 112214, ¶ 8. The doctrine of *res judicata* serves to bar any issues previously decided on appeal. *People v. Johnson*, 2013 IL App (5th) 110112, ¶ 10. As this court did not decide the propriety of Dawn's trial testimony, if challenged based on marital privilege, the specific issue presented by the defendant was not previously decided on appeal. However, our inquiry does not end there because "issues that could have been raised but were not [raised on direct appeal] are forfeited." *Tate*, 2012 IL 112214, ¶ 8. For reasons that may have been based in trial strategy, trial counsel opted not to raise marital privilege to combat Dawn's trial testimony. The issue was not raised on direct appeal, but clearly could have been. On that basis, we find that the defendant's argument is forfeited. *Id*. By failing to raise these issues in the appellate court on direct appeal, the defendant forfeited his argument that trial counsel was ineffective for not seeking to bar Dawn's testimony. *Pendleton*, 223 Ill. 2d at 476.

¶ 165    Furthermore, we find that the defendant waived his marital privilege in this case. The holder of a marital privilege may waive it explicitly or implicitly. See *People v. Hommerson*, 399 Ill. App. 3d 405, 412-14 (2010).

¶ 166    Our conclusion is supported by the fact that the defendant engaged in a virtually identical conversation with his father-in-law, James Ritchey. He told James Ritchey the same set of facts that he had previously told Dawn, including that Amy Blumberg had been shot in the head. Moreover, when the defendant was interviewed by police, he repeated these statements again. He acknowledged that he was in the O'Fallon store on the date of the murder; that he went to the store

to purchase a leotard for his daughter; that after he purchased the leotard, he drove onto the interstate, only to turn around and attempt to return the leotard over his concern that he had the incorrect size; that he reentered the store but did not see Amy Blumberg, but called out to her and began searching the store only to discover her body; that he touched Amy Blumberg's thigh and checked her body for a pulse; that he determined that she was deceased; and that he then fled the store, drove home, and told Dawn what had happened. Not only did the defendant tell these facts to Dawn, her father, and the police, but he also shared the details with Emily Hea Buss, Joseph Hea, and John Hackman.

¶ 167   In *People v. Simpson*, 68 Ill. 2d 276 (1977), the Illinois Supreme Court addressed waiver of the marital privilege. In *Simpson*, the defendant told his estranged wife that he had killed his paramour. *Id.* at 279. Later, at the police station, the police asked the estranged wife to come into an interview room where the defendant was speaking with the officers, and to tell them what the defendant told her back at their home. *Id.* The estranged wife reported that the defendant told her he killed his paramour. *Id.* The defendant then responded, " 'Yes, but I told you later I was lying.' " *Id.* The trial court would not allow the estranged wife to testify to this conversation at trial. *Id.* However, the trial court allowed an officer who was present when the estranged wife made the statement at the police station to testify about what the estranged wife and the defendant said. *Id.* The appellate court found that allowing the testimony about what was said at the police station was contrary to the "betrayal exception." *Id.* at 280 (citing *People v. Simpson*, 39 Ill. App. 3d 661, 670 (1976)). The "betrayal exception" utilized by the appellate court is applicable when a party attempts to introduce a marital communication that was revealed to a third party through "no conscious act of the protesting spouse." *Id.* at 280-81. In that limited situation, the court found that caselaw could support application of the marital privilege. *Id.* However, " 'a voluntary revelation

43

by the holder (of the privilege) of the communication, or of a material part, is a waiver.' " *Id.* at 281 (quoting McCormick on Evidence § 83, at 170 (2d ed. 1972)). In *Simpson*, the supreme court concluded that there was no foundation to uphold the marital privilege "where the very holder of that privilege consciously, and by his own act, reveals or confirms to third parties the content of a prior privileged communication." *Id.* The court stated that during the police station interview, when the defendant acknowledged he told his estranged wife that he had killed his paramour, the defendant voluntarily waived his marital privilege. *Id.*

¶ 168   In this case, after the defendant told Dawn about finding Amy Blumberg's body, he also told James Ritchey, and later informed the police during a recorded interview. In early January 2000, James Ritchey testified that the defendant and Dawn came to speak with him and told him about what he witnessed on December 31, 1999, including that Amy Blumberg had been shot in the head. Later, the defendant also informed Emily Hea Buss, Joseph Hea, and John Hackman of what he saw in O'Fallon on December 31, 1999, and what he did with the evidence afterwards. Then in the defendant's December 17, 2003, police-recorded interview, he told virtually the same story. Therefore, the defendant waived any privilege that was attached to the defendant's marital conversations with Dawn. *Id.* (quoting McCormick on Evidence § 83, at 170 (2d ed. 1972)).

¶ 169   We conclude that the defendant both forfeited the marital privilege issue relative to Dawn's trial testimony because that issue was not raised in his direct appeal and waived his marital privilege by telling his father-in-law, law enforcement, and other friends the information he had previously shared with his wife.

¶ 170   We next turn to the ineffective assistance issue. As stated earlier, the defendant's claims are analyzed under the *Strickland v. Washington* two-prong test: (1) that counsel's performance

44

was deficient and (2) that the deficient performance prejudiced the defendant. *Lefler*, 294 Ill. App. 3d at 311 (citing *Strickland*, 466 U.S. at 694).

¶ 171    Because we have concluded that the defendant waived his marital privilege, we are unable to find that trial counsel was ineffective for not objecting to Dawn's trial testimony on the marital privilege basis.

¶ 172    Further, after analyzing the record and arguments on appeal, we find that trial counsel's decision not to challenge Dawn's testimony, that would have been subject to the marital privilege, was based upon a thoughtful trial strategy. The defense pursued a strategy of thoroughly cross-examining and attacking Dawn to portray her as a vindictive woman who threatened the defendant with reporting him to the police—as she ultimately did—to possibly achieve a better settlement in their pending divorce. Trial counsel further impeached Dawn's testimony in questioning of other witnesses. This strategy was consistently used throughout the trial. Strategic choices made by counsel throughout trial are all but unchallengeable. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id.* An ineffective assistance claim cannot be based upon a matter of defense strategy unless that strategy was unsound. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). On appeal, a court of review must be highly deferential to counsel on strategy matters and must evaluate counsel's performance from the perspective at the time of trial rather than in hindsight. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Trial counsel's strategy does not deny due process to the defendant. See *People v. Reid*, 179 Ill. 2d 297, 310 (1997). When the alleged ineffectiveness of counsel was a matter of trial strategy, the allegations cannot support a claim of ineffective assistance. *Id.* Decisions of trial strategy rest with trial counsel. *Id.*

45

¶ 173 The failure to satisfy either prong of the *Strickland v. Washington* test precludes a finding that counsel was ineffective. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010). Although we are not bound to examine the second *Strickland* prong—prejudice—we will do so for completeness of our analysis. The defendant argues that the evidence was closely balanced and references the jury's deliberation that lasted more than two days as support for this claim. As we noted in the direct appeal, the length of the jury's deliberations is not a "barometer of the closeness of the evidence." *Phillips*, 2011 IL App (5th) 070416-U, ¶ 245 (citing *People v. Edwards*, 77 Ill. App. 3d 237, 244 (1979)).

¶ 174 Although the evidence in this case connecting the defendant to the murder was circumstantial in nature, there was ample evidence supportive of the defendant's conviction. We find that the outcome at trial would not likely have been different if the court had disallowed Dawn's testimony. While Dawn did report the defendant to law enforcement, she never accused him of murder. The defendant told the same story with minor variations to James Ritchey and witnesses Emily Hea Buss, Joseph Hea, and John Hackman. Both Emily Hea Buss and Joseph Hea were not friendly with Dawn and testified in the defendant's favor at the Phillips's dissolution trial. On direct appeal, we determined that the evidence presented at trial established the defendant's guilt beyond a reasonable doubt. We cite a portion of this analysis:

> "The defendant acknowledges that he went to the store and interacted with Amy in order to buy a leotard for his daughter apparently mere minutes before her murder. He places himself at the scene of the crime. He acknowledges being in the presence of her body after she was murdered, touching her body, getting blood on his clothing, subsequently fleeing the scene of the crime, not reporting the crime to any law enforcement authorities, and destroying all clothing he was wearing at the time that could tie him to the murder scene.
>
> The defendant told his then-wife Dawn as well as his friends Joseph Hea and John Hackman that he had traveled to the metro-east area on December 31, 1999, in order to go to a gun show. Dawn testified that the defendant left the home wearing a leather bomber jacket she had just given him a few days before and carrying a small gun case in which

46

they stored a .38-caliber pistol. Upon his return to the home, the defendant was not wearing his jacket any longer and had blood all over his pants legs. Dawn never saw the .38-caliber gun again. The defendant admitted to all of the witnesses, except the police, that when he arrived home on December 31, 1999, he lied to Dawn about the source of the blood— telling all witnesses that he told Dawn he had got blood on his pants when moving a dead animal to the side of the road. Later when he gave his statement to the police, the defendant told a different story that he immediately told his wife what had happened that day. The defendant claims that he did not come forward with the evidence for a variety of reasons. Initially, he claims to have been frightened and thought that the killer could be coming after him. Later, he told John Hackman that he fled the scene because he feared that police would determine that the handgun he had with him was unregistered. He told Joseph Hea that the gun he had been carrying that date matched the caliber of the weapon used to kill Amy as reported in news articles. He told Joseph Hea and John Hackman that he threw the gun away on the drive home that date. He told the witnesses that he also threw the leotard away at a convenience store where he had stopped to wash the blood from his hands and arms. Although the police investigators and the forensic pathologist were unable to determine Amy's cause of death by just looking at her, the defendant told John Hackman and James Ritchey that Amy had been shot in the head." *Phillips*, 2011 IL App (5th) 070416-U, ¶¶ 248-49.

In addition, all witnesses referenced in the above two paragraphs of our order on direct appeal urged the defendant to go to the police. Dawn and James Ritchey disputed the defendant's claim that they both told him to "stay out of it." In the fall of 2003, the defendant told Emily Hea Buss, Joseph Hea, and John Hackman that he had met with O'Fallon police detectives to tell the police what he knew, and that the O'Fallon police had cleared him. The jury later learned that this was a blatant fabrication. Dawn testified that she found it unusual that the defendant purchased their daughter a leotard because she remembered no other time that the defendant bought any clothing for their children.

¶ 175   The jury also watched the defendant's recorded interview with police. While the defendant could remember precise details about the alleged man he saw exiting the store before he entered the store and discovered Amy Blumberg's body, he claimed not to be able to remember details about Amy Blumberg's state of dress upon discovery of her body. That statement is in contradiction to what he told his wife the day after the murder. In addition, the jury heard a taped

47

conversation when the defendant told James Ritchey that he did not own a .380-caliber gun. The jury then heard testimony from an acquaintance of the defendant that he sold him a .380-caliber gun in 1992. Dawn testified that on the day of the murder, the defendant left the home carrying the case in which he stored his .380-caliber gun, and that she never saw the case or the gun again.

¶ 176   Overall, we find that the evidence presented by the State to prove the defendant's guilt was not closely balanced. Based upon the strength of the evidence, we find that there was no reasonable probability that the outcome would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). We conclude that the defendant is also unable to establish the prejudice prong of *Strickland. Strickland*, 466 U.S. at 694. The defendant's claim that trial counsel was ineffective fails.

¶ 177   We next turn to the defendant's claim that appellate counsel was ineffective. Claims of ineffective assistance of appellate counsel are considered using the same standard as those alleging ineffective assistance of trial counsel. *Childress*, 191 Ill. 2d at 175. Thus, the defendant must satisfy both *Strickland v. Washington* prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Lefler*, 294 Ill. App. 3d at 311 (citing *Strickland*, 466 U.S. at 694). A defendant alleging that appellate counsel was ineffective must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner. *People v. West*, 187 Ill. 2d 418, 435 (1999). If the underlying issue is not meritorious, the defendant did not suffer prejudice from counsel's failure to raise it on direct appeal. *Id.*

¶ 178   Appellate counsel is not required to brief every possible issue on appeal. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). If appellate counsel determines that certain issues have no merit, appellate counsel is not incompetent from refraining to raise those issues. *Id.* However, if appellate

counsel's appraisal of the merits of an issue or issues is clearly wrong, then the question of counsel's competence is at issue. *Id.* On review, we construe appellate counsel's decisions on issues raised on appeal with substantial deference. *People v. Borizov*, 2019 IL App (2d) 170004, ¶ 14. We also must examine the merits of the underlying issue because a defendant is not prejudiced by appellate counsel's failure to raise an issue that is without merit. *Simms*, 192 Ill. 2d at 362.

¶ 179 Previously in this order, we discussed the marital privilege issue raised by appellate counsel on direct appeal. Appellate counsel did not raise the marital privilege on direct appeal in the context of Dawn's testimony. A spouse cannot testify in criminal proceedings against the other spouse about communications or admissions that occurred during the marriage. 725 ILCS 5/115-16 (West 2002). That privilege is waivable if the marital partner consciously reveals the content of the prior privileged communication with a third party. *Simpson*, 68 Ill. 2d at 281 (quoting McCormick on Evidence § 83, at 170 (2d ed. 1972)). We have already concluded that the defendant waived his marital privilege relative to Dawn's trial testimony because he engaged in nearly identical communications with John Ritchey, Emily Hea Buss, Joseph Hea, John Hackman, and law enforcement.

¶ 180 As we find that the defendant waived his marital privilege, we find that appellate counsel could not have provided ineffective assistance by failing to raise the issue in this context. Furthermore, given the strength of the State's evidence at trial, as outlined in our discussion of the ineffective assistance of trial counsel, we find that there is no reasonable probability that the appeal would have been successful. Accordingly, the defendant was not prejudiced. As the defendant is unable to establish either *Strickland* prong, we conclude that he cannot establish that appellate counsel provided ineffective assistance.

¶ 181 In this case, the trial court based its dismissal of the defendant's second-stage postconviction petition relative to the marital privilege issue on the doctrine of *res judicata*. Although we affirm the trial court's dismissal on a different basis—that the defendant was unable to establish the prejudice prong of *Strickland v. Washington*—we can affirm a trial judge's decision on any basis that appears of record. *People v. Huff*, 195 Ill. 2d 87, 91 (2001); *People v. Yarber*, 279 Ill. App. 3d 519, 524 (1996).

¶ 182                                B. *Brady v. Maryland* Violation

¶ 183 The defendant next argues that the State withheld discovery of a recorded message from him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady v. Maryland*, the United States Supreme Court held that when the prosecution withholds evidence from the accused that is both "favorable to the accused and material to guilt or punishment," the prosecution is guilty of violating an accused's constitutional right to the due process of law. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (citing *People v. Harris*, 206 Ill. 2d 293, 311 (2002), citing *Brady*, 373 U.S. at 87). To remain compliant with *Brady*, the State has a duty to identify evidence favorable to the defendant that is known not only by its prosecutors, but also by other government actors, including the police department. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). In *Strickler v. Greene*, 527 U.S. 263, 281 (1999), the United States Supreme Court noted the "special role played by the American prosecutor in the search for truth in criminal trials," and that the goal in a prosecution is not to win the case, but to ensure that " 'justice shall be done' " (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

¶ 184 For the accused to establish that the State violated *Brady v. Maryland*, he must show: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and

50

(3) the accused was prejudiced because the evidence is material to guilt or punishment." *Beaman*, 229 Ill. 2d at 73-74 (citing *People v. Burt*, 205 Ill. 2d 28, 47 (2001), citing *Strickler*, 527 U.S. at 281-82). "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74 (citing *Harris*, 206 Ill. 2d at 311, citing *Kyles*, 514 U.S. at 434). Further, "[m]ateriality is demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Coleman*, 183 Ill. 2d at 393 (quoting *Kyles*, 514 U.S. at 435). Additionally, in determining whether the evidence is material, courts must look to the cumulative effect of the evidence that was withheld rather than considering the evidentiary items individually. *Beaman*, 229 Ill. 2d at 74 (citing *People v. Hobley*, 182 Ill. 2d 404, 435 (1998), citing *Kyles*, 514 U.S. at 436-41). If any court of review determines that the State committed a *Brady* violation, the constitutional error cannot be classified as harmless. *Id.* (citing *Coleman*, 183 Ill. 2d at 393, quoting *Kyles*, 514 U.S. at 436).

¶ 185   In this case, the defendant claims that the State committed a *Brady* violation because the State failed to disclose or provide a recording of Dawn's second threatening voicemail message left on his cell phone answering system. He argues that this second recording would have enabled his attorney to damage Dawn's credibility. In January 2015, the defendant filed a Freedom of Information Act request with the O'Fallon Police Department, and the recording was thereafter produced.

¶ 186   Dawn left the first message on August 14, 2003, during the divorce proceedings. In the message, Dawn stated:

> "Ed[,] I just wanted to ask you if you had any input on this before I make a call. I thought I was going to call Jim Stover of the O'Fallon Police Department about an unsolved murder. I just wondered if you had any thoughts on that before I made the call. I'll talk to you later. Bye."

51

In response, the defendant responded with his own voicemail on August 17, 2003, stating:

> "Hi, Dawn. I just wondered if you had any input on this and I just wanted to check with you first in case I decided to make a call. I made a little trip to talk to some people and I decided to make a statement, and these nice people assured me that there is absolutely nothing to be concerned about. In fact, someone mentioned a term called attempted blackmail. This would be a good time to stop playing games and treat each other like we at least used to love each other. So[,] I guess it is back to the bargaining table since I want the home and 50-50 visitation and you will have custody and I will help you get a place if you treat me like you know you should. I just wanted to get your input first in case I decided to make a call. I guess I'll talk to you later."

Thereafter, Dawn responded with her second voicemail on August 18, 2003, stating:

> "Hi, Ed. It's Dawn. I just got your last message. Okay. I guess it won't be blackmail because I'm gonna call Captain Jim Stover tomorrow at the O'Fallon Police Department and I guess we'll just do this. I can't understand why you won't be nice and I guess it is what I will have to do. Well, I will talk to you later. Bye."

¶ 187   The defendant cited to these transcripts in his affidavit and addendum to the postconviction petition filed with the court in February 2018. After the second voicemail from Dawn, the defendant recorded the messages onto a cassette tape. He placed the cassette tape into an envelope labeled "blackmail tape" and stored the envelope in his vehicle. A search warranted was executed on the defendant's vehicle on December 18, 2003. The cassette tape was collected and inventoried. For some reason, the State did not send the defendant's responsive message, and Dawn's second message, when they provided a recording to the defense.

¶ 188   The defendant argues that the State's failure to produce a copy of the second recording violated *Brady v. Maryland* and deprived him of his due process rights (*Beaman*, 229 Ill. 2d at 73 (citing *Brady*, 373 U.S. at 87)). He also contends that the State deprived him of his constitutional rights in that the evidence was favorable to the defendant and could have been used in Dawn's cross-examination. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8.

¶ 189   Turning to the *Brady v. Maryland* requirements, the missing voicemail message was certainly impeaching in character and thus could have been favorable to the defendant. We

52

acknowledge that the jury was aware that the defendant and Dawn had been engaged in a contentious divorce, and that the defendant stated Dawn had left threatening voicemails. Dawn confirmed that she had left him at least one message that she characterized as being "sarcastic" in nature, and that she may have left him more than one message of that type. Moreover, there is no question that the State did not copy this second voicemail message and provide the message to the defense.

¶ 190   While the defendant has established the first and second elements required for a *Brady* violation, we conclude that the defendant is unable to establish the third element that he "was prejudiced because the evidence is material to guilt." *Beaman*, 229 Ill. 2d at 73-74 (citing *Burt*, 205 Ill. 2d at 47, citing *Strickler*, 527 U.S. at 281-82). We do not find that there is a reasonable probability that the jury's verdict would have been different if the jury had heard the second recording of Dawn's voicemail message. *Id.* at 74 (citing *Harris*, 206 Ill. 2d at 311, citing *Kyles*, 514 U.S. at 434). The type of material evidence that satisfies the *Brady* requirement is evidence that would undermine confidence in the verdict. *Coleman*, 183 Ill. 2d at 393.

¶ 191   As we have stated earlier in this order, the evidence in this case was circumstantial, but there was a vast amount of circumstantial evidence. Dawn never accused the defendant of the murder of Amy Blumberg even though she reported him to the police. The defendant told Dawn, James Ritchey, Emily Hea Buss, Joseph Hea, and John Hackman variations of the "discovery" of Amy Blumberg's body and disposal of his gun and other evidence. In his recorded interview, the defendant told O'Fallon police officers that he entered the store to purchase a leotard and, upon returning to the store, he found blood, and then Amy Blumberg's body. He admitted that he touched her body and that her blood got onto his clothing. He further acknowledged that he destroyed the pants he was wearing when he discovered the body. He told James Ritchey and John

53

Hackman that Amy Blumberg had been shot in the head, even though the police and a forensic pathologist were unable to determine Amy Blumberg's cause of death upon viewing her body. Multiple people urged the defendant to go to the police to tell them what he saw. The defendant later misled his friends by stating that he had spoken to the O'Fallon police, and that he had been exonerated.

¶ 192   While no physical evidence tied the defendant to Amy Blumberg's murder, we find that if the defense had received the second voicemail message and used it to further cross-examine Dawn, the jury's verdict would not likely have changed. The jury heard the defendant tell the police on the recorded interview that Dawn was blackmailing him to get a better outcome in their divorce. The first voicemail message was played for the jury. While Dawn testified that the voice on that recording did not sound like hers, she freely admitted that she had sent "sarcastic" voicemail messages. She testified: "Well, I called him and said and was kind of sarcastic. And said if you continue to do the things that you're doing then I'm going to tell the Court everything I've ever known about you including the scene that you witnessed that you didn't report." The jury also heard defense counsel thoroughly cross-examine Dawn about the voicemail message, and about a recorded interview with law enforcement during which she told the officers that she made a threatening call to the defendant because he was threatening her about custody of the children. Overall, the defense strategy in this case was to portray Dawn as a bitter, vindictive woman who went after the defendant by going to the O'Fallon Police Department. We do not find that the inclusion of the second recorded call would have impacted the outcome of this trial. For these reasons, we do not find that the defendant has established a *Brady* violation.

¶ 193   As stated earlier in this order, the trial court based its dismissal of the defendant's second-stage postconviction petition relative to the *Brady v. Maryland* issue on the doctrine of

54

*res judicata*. Although we affirm the trial court's dismissal on a different basis—that the defendant was unable to establish the prejudice element required for a *Brady* violation—we can affirm a trial judge's decision on any basis that appears of record. *Huff*, 195 Ill. 2d at 91; *Yarber*, 279 Ill. App. 3d at 524.

¶ 194                    C. Ineffective Assistance of Postconviction Counsel

¶ 195   The defendant finally argues his postconviction counsel was ineffective for failing to raise the issue that trial counsel failed to seek redaction of the defendant's reference to the order of protection from the recording of his police interview.

¶ 196   The right to counsel in postconviction proceedings is based in statute—not the federal and state constitutions. See 725 ILCS 5/122-4 (West 2012). Therefore, postconviction petitioners are only guaranteed the level of legal assistance required by the Post-Conviction Hearing Act. *People v. Owens*, 139 Ill. 2d 351, 364 (1990). While a reasonable level of assistance is required by section 122-4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/122-4 (West 2012)) and Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), defendants are not guaranteed the same level of legal assistance constitutionally guaranteed to defendants at trial. *Pendleton*, 223 Ill. 2d at 472; *People v. Greer*, 212 Ill. 2d 192, 204 (2004); *Owens*, 139 Ill. 2d at 364.

¶ 197   The Post-Conviction Hearing Act does not require that postconviction counsel provide more than "reasonable assistance," and thus, any claim of ineffective assistance of postconviction counsel is outside of the scope of the Act and is not allowed. *People v. Wright*, 149 Ill. 2d 36, 64 (1992). "A defendant may not properly assert a constitutional claim of ineffective assistance of postconviction counsel [citation] because a postconviction petitioner is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act." *People v. Pinkonsly*, 207 Ill. 2d 555,

567 (2003); *People v. Davis*, 156 Ill. 2d 149, 158-59 (1993) (citing *People v. Flores*, 153 Ill. 2d 264, 276 (1992)).

¶ 198    Illinois Supreme Court Rule 651(c) provides the foundation for our appellate review. To ensure reasonable assistance, Rule 651(c) requires that the record in postconviction proceedings demonstrate that postconviction counsel meet three specific obligations. *People v. Lander*, 215 Ill. 2d 577, 584 (2005). Counsel must (1) consult with the defendant to ascertain his claims of error, (2) examine the trial court record, and (3) make any amendments to the petition that are necessary to adequately present the defendant's claims to the postconviction court. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The duty to amend the petition requires postconviction counsel to "shape the petitioner's claims into proper legal form." *People v. Perkins*, 229 Ill. 2d 34, 43-44 (2007). Similarly, the Rule 651(c) requirement that postconviction counsel must examine the record only requires that counsel "examine as much of the [record] as is necessary to adequately present and support those constitutional claims raised by the petitioner." *Davis*, 156 Ill. 2d at 164.

¶ 199    One aspect of "reasonable assistance" is compliance with Supreme Court Rule 651(c). Ill. S. Ct. R. 651(c); *People v. Daniels*, 388 Ill. App. 3d 952, 960 (2009) (citing *People v. Bashaw*, 361 Ill. App. 3d 963, 967 (2005)). A Rule 651(c) certificate filed by postconviction counsel presents a rebuttable presumption that counsel provided reasonable assistance. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. The defendant has the burden to overcome this presumption by establishing that his or her postconviction counsel did not comply with the mandatory Rule 651(c) duties. *Id.* The question of whether the defendant was provided with a reasonable level of assistance is reviewed *de novo. People v. Wallace*, 2018 IL App (5th) 140385, ¶ 31. When a defendant claims that postconviction counsel deficiently performed his or her duties or in some other way failed to provide reasonable assistance, "the defendant must show not only how the

56

attorney's performance was deficient or unreasonable but also what prejudice resulted from that deficiency." *People v. Landa*, 2020 IL App (1st) 170851, ¶ 58.

¶ 200   Before we review the specific claim raised by the defendant, we will review the three obligations imposed upon postconviction counsel by Supreme Court Rule 651(c) to determine in a general sense whether postconviction counsel's actions and filings complied with the Rule 651(c) obligations. We start with the Rule 651(c) certificate filed with the court on February 5, 2018. The defendant's attorney certified that he had consulted with the defendant "by mail, by phone, and in person to ascertain his contentions of deprivation of constitutional rights, that he has examined the record of the proceedings at the trial, and that to the best of his knowledge this is an original petition so no amendments to a pro se petition are necessary in order to adequately present the [defendant's] contentions."

¶ 201   On direct appeal, we delved into the question of the unredacted order of protection language in a different context. On direct appeal, the defendant argued that the trial court erred in denying his request for a mistrial regarding his reference to the order of protection against him on the videotaped statement. In our order, we noted that trial counsel had filed a motion to redact the videotaped statement. *Phillips*, 2011 IL App (5th) 070416-U, ¶ 198. However, the motion did not specifically ask that the order of protection language be redacted. *Id.* We also noted that the parties had agreed to advise all witnesses to make no references to an order of protection. *Id.* At the hearing on the motion for a mistrial, the prosecutor stated that he did not believe that the parties' agreement regarding advising all witnesses to avoid that reference would extend to the videotaped interview of the defendant himself. *Id*. In affirming the trial court, we stated that the jury heard no additional details and was not informed that the defendant had been convicted of violating the terms of the order of protection, and we noted that the defendant's reference on the videotape to the order of

57

protection was designed to portray himself as a victim: "the tape was not a question by the police officers, but was brought up by the defendant as a means to explain to the officers that his wife, Dawn, was threatening him in his divorce proceeding relative to the information he knew about this murder." *Id.* ¶ 199.

¶ 202   The State argues that the issue is barred by the doctrine of *res judicata* because on direct appeal we affirmed the trial court's denial of the defendant's mistrial request based on the same order of protection reference in the videotape. As with the issue of marital privilege, we decline to extend the doctrine of *res judicata* to this matter. The issue's presentation on direct appeal was different than the presentation of the issue on postconviction appeal. While both issues factually involved the defendant's order of protection statement on the tape, the legal presentation and argument in these two appeals were disparate.

¶ 203   Although postconviction counsel did not raise this issue in the original postconviction petition or in the defendant's addendum, that "failure" does not automatically mean that counsel was ineffective. Postconviction counsel is not required to provide more than "reasonable assistance." *Wright*, 149 Ill. 2d at 64. The record on appeal amply reflects that counsel met the three obligations of Supreme Court Rule 651(c), and thus provided reasonable assistance. Ill. S. Ct. R. 651(c); *Daniels*, 388 Ill. App. 3d at 960 (citing *Bashaw*, 361 Ill. App. 3d at 967). The Rule 651(c) certificate supports this conclusion. Counsel certified that he consulted with the defendant by mail, phone, and in person to ensure that the defendant's claims of constitutional rights violations were raised. Counsel confirmed that he had reviewed the record, and that no further amendments were needed. We find that the defendant is unable to overcome the presumption of reasonable assistance resulting from the certificate filed by postconviction counsel. *Profit*, 2012 IL App (1st) 101307, ¶ 19.

¶ 204   Reviewing the record on appeal, the reference was one that the defendant made during the interview to discredit Dawn's report to the police that he had been at the scene of the murder—to establish her motive for revenge. The reference was cursory, and no further details about the events resulting in the order of protection were referenced at any point during the trial. The jury was never informed that the defendant was subsequently arrested for and convicted of violating that order of protection. We cannot find that the defendant suffered prejudice from this single reference in his videotape, and do not find that postconviction counsel was ineffective for not raising this claim in his petition.

¶ 205                              III. CONCLUSION

¶ 206   For the reasons stated in this order, the judgment of the circuit court of St. Clair County dismissing the defendant's second-stage postconviction petition is hereby affirmed. We also deny the defendant's claim that postconviction counsel provided ineffective assistance.


¶ 207   Affirmed.